HADLOCK, J.
*337 In the final order challenged in this judicial review proceeding, the Oregon Bureau of Labor and Industries (BOLI) determined that respondent Johnson, owner and operator of Duck Stop Market (DSM), violated ORS 659A.142(4) and OAR 839-006-0300(2) (Feb. 24, 2010) when she refused to allow complainant, an individual with a disability, to enter DSM with a service dog. In seeking judicial review, Johnson makes three narrow arguments, each of which we reject for the reasons set out below. Accordingly, we affirm.
On April 17, 2013, complainant visited DSM, accompanied by her husband and two dogs, Contessa and Panda. Complainant is visually impaired, hard of hearing, and has been diagnosed with PTSD, agoraphobia, and schizophrenia. Along with a friend, Murlin, complainant operates Sunstone Service Dogs, a nonprofit organization that trains service dogs. In April 2013, Contessa was still considered "in training" with Sunstone Service Dogs. However, by that time, she had been trained to assist complainant by performing several tasks, including "covering" and chest compression during a PTSD attack, alerting complainant to take her medication, opening and closing doors, providing tactile stimulation, helping complainant walk through crosswalks, alerting complainant to traffic, leading complainant to vehicles that she was to travel in, and helping complainant avoid running into objects. By the same date, Panda was trained to assist complainant by performing tasks including "covering" and chest compression during a PTSD attack, waking complainant from nightmares and calming her, helping complainant breathe again after complainant stops breathing at night, and *1073 ensuring that complainant does not run into street curbs or objects.
When complainant and her husband visited DSM on April 17, both animals were leashed and Contessa wore a "service dog in training" vest, along with a soft muzzle and training harness. Shortly after the complainant, her husband, Contessa, and Panda entered DSM, respondent said they could not bring dogs into the store and that they needed to leave. Complainant informed respondent that Panda and *338 Contessa were service dogs and referenced a sign in the DSM's front window allowing service dogs. Respondent stood by her initial statement, suggesting that complainant use the DSM's drive-up window or let DSM employees hold the dogs outside while complainant shopped. Eventually, complainant stayed outside of DSM with Contessa and Panda while her husband went into the store.
After that visit, respondent briefed her employees on the incident and told them that she did not want the dogs in DSM. Meanwhile, complainant completed a BOLI "Civil Rights Division Public Accommodation Discrimination Questionnaire" online and asked Elizabeth Fuell, a caregiver, to help her organize paperwork about service dogs and to accompany her to DSM the next day as an observer.
On April 18, complainant and Fuell visited DSM, bringing Contessa, who wore her service dog in training vest. Respondent was not present, but a store clerk met complainant and Contessa at the door, telling complainant, "You're not welcome here; your dog needs to leave." Complainant notified the clerk that Contessa was a service dog and Fuell announced that she was recording the conversation. The clerk told the two that she did not care and threatened to call the police if they did not go outside. Fuell then called the sheriff's department, and while she, complainant, and Contessa waited in Fuell's car for deputies to arrive, someone from DSM came out and told them that "No matter what happen[ed], [they were] 86'd off the property." When deputies arrived, they took handouts that complainant and Fuell had brought along and gave them to the clerk before asking complainant and Fuell to leave, suggesting that complainant come back the next day to meet with respondent. Complainant was upset by that incident and decided to complete a new online BOLI "Civil Rights Division Public Accommodation Discrimination Questionnaire" addressing that experience and to go back to the store the next day to meet with respondent.
On April 19, complainant returned to DSM with Contessa and Murlin. Respondent and the store clerk met them in front of DSM, and the four had a conversation in which respondent agreed to read material about the *339 Americans with Disabilities Act (ADA) that complainant provided her but also told complainant that dogs were not allowed in DSM and that complainant was not allowed back to DSM until respondent decided what she would do about complainant's dogs.
A few days later, respondent called complainant to notify her that respondent had read the materials and would allow complainant to shop at DSM so long as she brought only one dog. Complainant did not return to DSM after that conversation. Complainant experienced trauma from her interactions with respondent and DSM and became more reticent about leaving her home.
Following those events, respondent and her employees committed multiple acts that did not take place at DSM and caused distress to complainant, which BOLI determined contributed to its damages award, including mailing a letter to Murlin at Sunstone Service Dogs, which complainant perceived as a threat; following complainant as she took a bus; following and photographing complainant and her young granddaughter on a walk; and photographing complainant's apartment and complainant's neighbor's car.
Within a few weeks of the incidents at DSM, complainant filed a complaint with BOLI, asserting that respondent had discriminated against her because of her disability. BOLI subsequently issued formal charges alleging, as pertinent here, that respondent had violated ORS 659A.142(4), which prohibits any "place of public accommodation" from making "any distinction, discrimination or restriction because a customer or patron is an individual with a disability."[1]
*1074 Specifically, BOLI asserted that respondent had violated that statute on each of three days by refusing to allow complainant to shop at or enter DSM with dogs that were trained to assist with complainant's disabilities, including visual impairment. BOLI requested that complainant be *340 awarded at least $30,000 in damages for physical, mental, and emotional distress.
After a contested-case hearing, BOLI issued a final order that includes two legal conclusions that respondent challenges on judicial review: (1) that respondent violated ORS 659A.142(4) on April 17 and 18, 2013, by refusing to allow complainant to "enter DSM to purchase groceries while accompanied by her service animal," and (2) that respondent violated ORS 659A.142(4) on April 19, 2013, by telling complainant "that her dogs were not allowed in DSM and that complainant was not allowed on DSM's property until Respondent determined what to do with Complainant's service dogs." BOLI ordered respondent to pay $60,000 in damages for the "emotional, mental, and physical suffering" that complainant experienced as a result of respondent's unlawful practices. In addition to challenging BOLI's determination that she violated ORS 659A.142(4), respondent challenges that damages award.
Before addressing respondent's challenges to BOLI's final order, we explain the reasoning that BOLI employed in determining that respondent violated ORS 659A.142(4) when she refused to allow complainant into DSM with her service dogs. BOLI's rationale is based largely on ORS 659A.139 (2011), amended by Or. Laws 2013, ch. 740, § 12, which references the ADA and which this court has called a "lockstep" statute. Evans v. Multnomah County Sheriff's Office , 184 Or. App. 733, 743, 57 P.3d 211 (2002), rev. den. , 335 Or. 180, 63 P.3d 27 (2003). The lockstep statute requires that certain Oregon statutes that prohibit discrimination against people with disabilities be construed consistently with similar ADA provisions to the extent possible; it provided in pertinent part:
"(1) ORS 659A.103 to 659A.145 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended by the federal ADA Amendments Act of 2008 and as otherwise amended."
ORS 659A.139 (2011). Noting that the version of ORS chapter 659A in effect in April 2013 did not include provisions related to allowing service dogs in places of public accommodation, *341 BOLI-in reliance on the lockstep statute-"turn[ed] for guidance to Title III of the ADA and 28 CFR § 36.302(c)."[2]
The referenced federal regulation required places of public accommodation to permit individuals with disabilities "the use of a service animal" except if the animal "is out of control and the animal's handler does not take effective action to control it" or the animal "is not housebroken." 28 CFR § 36.302(c). A related regulation, on which BOLI also relied, defined "service animal" to mean "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 CFR § 36.104 (2012).[3]
Based on that federal law and ORS 659A.139 (2011), BOLI concluded that "Oregon law in April 2013 required places of public accommodation to allow individuals with disabilities to be accompanied by their service animal" unless the animal was out of control or not housebroken. BOLI further determined that both Contessa and Panda were service animals and that respondent therefore violated ORS 659A.142(4) when she refused to allow complainant to enter DSM while accompanied by one or both of the *1075 dogs. As noted, BOLI's final order reflects those determinations and imposes a $60,000 damages award, and respondent seeks judicial review.
We discuss each of respondent's challenges to BOLI's final order below. Preliminarily, however, we explain what respondent does not challenge on judicial review, to clarify the narrow arguments that she makes to this court.
First, respondent does not dispute either that DSM was a place of public accommodation, as defined in ORS chapter 659A, or that complainant was an individual with a disability for purposes of the Oregon statutes prohibiting disability-based discrimination. Second, respondent does not challenge BOLI's reliance on the ADA and associated *342 federal regulations as the basis for concluding that, in April 2013, Oregon law required places of public accommodation to allow individuals with disabilities to be accompanied by their service animals. Third, except as discussed below, respondent does not challenge BOLI's reliance on the definition of "service animal" that is supplied by 28 CFR section 36.104. Finally, respondent does not contend that the factual findings in the order are not supported by substantial evidence; nor does she contend that the order is not supported by substantial reason.
Rather, respondent raises only narrow challenges to certain aspects of BOLI's legal reasoning; accordingly, we review those parts of the final order for legal error. See ORS 183.482(8)(a) ("If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall * * * [s]et aside or modify the order; or * * * [r]emand the case to the agency for further action under a correct interpretation of the provision of law.").
In her first assignment of error, respondent contends that BOLI erred in concluding that Panda was a service animal on April 17, 2013. The ADA requires that a service animal "be under the control of its handler." 28 CFR § 36.302(4). Respondent argues that the term "handler," as used in the regulation, refers only to the individual with a disability to whom the service animal is assigned, here complainant, and that, because Panda was under the control of complainant's husband during their visit to DSM, respondent had the right to exclude Panda.
We disagree. Respondent offers no reason that the term "handler" in 28 CFR section 36.302(c)(4) should refer only to the individual with a disability. Neither 28 CFR section 36.302(c)(4) nor 28 CFR section 36.104, which defines service animals, limits the term "handler" to the individual with a disability. To the contrary, the United States Department of Justice, which implements the ADA, issued a final rule correction in 2011 clarifying the definition of "service animal" in 28 CFR section 36.104, which had previously included the following text: "The work or tasks performed by a service animal must be directly related to the handler's *343 disability." Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities; Final Rule, 75 Fed. Reg. 56236-01 (Mar. 15, 2011). The rule was corrected by replacing the word "handler's" with the word "individual's." Nondiscrimination on Basis of Disability by Public Accommodations and in Commercial Facilities; Corrections, 76 Fed. Reg. 13286-01 (Mar. 15, 2011). That change to the text of the rule was accompanied by the following explanation: "Because a service animal is not always controlled by the individual with a disability, the service animal's 'handler' is not necessarily the individual with a disability." Id. That rule correction defeats respondent's argument that Panda was not a service animal because complainant's husband was the animal's "handler" during the April 17, 2013, visit to DSM.
Respondent's second assignment of error challenges BOLI's determination that Contessa was a service animal at all. Respondent primarily contends that Contessa did not meet the ADA definition of "service animal" because she was still in training and, therefore, was not a "dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability." 28 CFR § 36.104 (emphasis added). Because Contessa had not completed her training, respondent concludes, she was not a service animal that respondent was required to allow into DSM. In response, BOLI points to its *1076 unchallenged factual finding that, although Contessa was still in training during April 2013, "she was trained at the time to perform specific tasks to mitigate Complainant's impairments." BOLI argues that Contessa was, therefore, a "service animal" for purposes of the ADA.
We agree with BOLI. Under 28 CFR section 36.104, a dog is a "service animal" if it is individually trained to do work or perform tasks for an individual with a disability and the work or tasks relate directly to the person's disability. The regulation specifically contemplates that the dog's work may include assisting visually impaired individuals "with navigation and other tasks." 28 CFR section 36.104. Here, BOLI found that Contessa had started training with complainant in early 2012 and was, in April 2013, trained to *344 assist complainant with specific tasks related to her disabilities, including her visual impairment, such as helping complainant walk through crosswalks, alerting complainant to traffic, leading complainant to vehicles that she was to travel in, and opening and closing doors. The fact that Contessa was trained to perform those tasks in April 2013 means that she was then a "service animal" as defined in 28 CFR section 36.104, even though her training continued. Nothing in that regulation limits the definition of "service animal" to dogs that have completed all training that is contemplated or possible.
Although respondent does not challenge BOLI's reliance on the ADA definition of "service animal," she criticizes BOLI for not having also taken into account an Oregon statute-not included in ORS chapter 659A-that, in April 2013, specified when a "person with a physical impairment" was entitled to "have an assistance animal with the person * * * in any place of public accommodation." Former ORS 346.685(1) (2011), repealed by Or. Laws 2013, ch. 530, § 10. For purposes of that statute, "assistance animal" was defined to mean "any animal trained to assist a person with a physical impairment in one or more daily life activities." Former ORS 346.680(1) (2011), repealed by Or. Laws 2013, ch. 530, § 10. Respondent points out that the chapter 346 statutes also included a definition of an "assistance animal trainee" and provided that "a trainer [had] the right to have an assistance animal or assistance animal trainee with the trainer" in places of public accommodation. Former ORS 346.680(2) (2011) ; former ORS 346.685(1) (2011).[4] Respondent appears to suggest that BOLI should have looked to the chapter 346 statutes, determined that Contessa was only an "assistance animal trainee," and concluded that only a trainer (not complainant) would have been entitled to bring Contessa into DSM. Respondent accuses BOLI of impermissibly disregarding those chapter 346 provisions.
We disagree. Respondent does not dispute that, under ORS 659A.139 (2011), BOLI appropriately looked to *345 the ADA definition of "service dog" in determining whether respondent violated ORS 659A.142(4) when she refused to allow complainant to bring Contessa into DSM. We are not persuaded that BOLI should also have looked to an Oregon statute not referenced in ORS chapter 659A in making that determination. As BOLI explained in its final order, ORS 659A.139 (2011) reflected a legislative choice "to specifically defer to the ADA," not to the provisions of former ORS 346.680 (2011) and ORS 346.685 (2011).[5]
In her third assignment of error, respondent contends that BOLI wrongly interpreted state law by basing its damages award on events that occurred after April 22, 2013. According to respondent, because those events did not take place at DSM, as a matter of law, none of them could constitute an "unlawful practice," as that term is used in ORS 659A.001(12) and ORS 659A.142(4). Relatedly, respondent also contends that BOLI abused its discretion by awarding complainant damages that are based on events *1077 not alleged in the formal charges and that are punitive in nature.
Respondent did not present any of those legal arguments to BOLI. Rather, before BOLI, respondent generally "object[ed] to the forum's proposed damages award in its entirety," and argued as a factual matter that post-April 22 events did not contribute to the harm that complainant suffered and should not, therefore, be accounted for in the damages award. Consequently, the legal arguments that respondent makes to us are not preserved for judicial review. See Augustus v. Board of Nursing , 284 Or. App. 420, 425, 392 P.3d 788 (2017) ("[T]o preserve a contention for * * * judicial review, a party must provide the * * * agency with an explanation of * * * her objection that is specific enough to ensure that the * * * agency is able to consider the point and avoid committing error.").
Affirmed.

In 2013, the legislature enacted ORS 659A.143, which includes detailed provisions about assistance animals and, among other things, the circumstances under which places of public accommodation "may not deny a person with a disability * * * the right to be accompanied by an assistance animal * * * in any area of the place that is open to the public or to business invitees." ORS 659A.143 (6)(a). Those amendments were not yet effective in April 2013, when the events pertinent to this case occurred. Or. Laws 2013, ch. 530, § 12.

Like the parties, we rely on the version of the federal regulations that were in effect in April 2013. Thus, this and all subsequent references to 28 CFR section 36.302 refer to the 2012 version.

All subsequent references to 28 CFR section 36.104 refer to the 2012 version.

"Assistance animal trainee" was defined as "any animal undergoing training to assist a person with a physical impairment." Former ORS 346.680(2) (2011).

In any event, given BOLI's finding that Contessa had already been trained, in April 2013, to assist complainant with a wide variety of tasks, we do not understand why Contessa would not have met the definition of "assistance animal" set out in former ORS 346.680(1) (2011), even if she might also have met the definition of "assistance animal trainee" as her training continued.